UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA


UNITED STATES OF AMERICA,        )
                                 )
          Plaintiff,             )
                                 )
     vs.                         )   CASE NO. 3:14-cr-00069-SLG-DMS
                                 )
BOONCHAN YANG,                   )
                                 )
          Defendant.             )
_____)




TRANSCRIPT OF HEARING ON PETITION TO REVOKE SUPERVISED RELEASE
                        (DKT 107)
     BEFORE THE HONORABLE DEBORAH M. SMITH, MAGISTRATE JUDGE
                   May 28, 2021; 2:06 p.m.
                      Anchorage, Alaska




**FOR THE GOVERNMENT:**
          Office of the United States Attorney
          BY: STEPHAN A. COLLINS
          222 West 7th Avenue, #9
          Anchorage, Alaska  99513
          907-271-5071

**FOR THE DEFENDANT:**
          Office of the Federal Public Defender
          BY: GRETCHEN L. STAFT
          900 West 5th Avenue, Suite 200
          Anchorage, Alaska  99501
          907-646-3400


_____
                 R. JOY STANCEL, RMR-CRR
              Federal Official Realtime Reporter
                 222 West 7th Avenue, #4
                  Anchorage, Alaska  99513
             Proceedings Recorded by Digital Recording
               Transcript Produced by Computer

```
                          I N D E X

                   May 28, 2021; VOLUME I
```

Government's
Witnesses:              Direct   Cross   Redirect   Recross

Jared Kabulski            4       16      32/47       41

Benjamin Schmidt         50       58        64

```
                     - - - - -
```

```
              E X H I B I T   I N D E X
```

Exhibit                                              Page

Government 7     Blank Chain of Custody Form          58

```
                     - - - - -
```

```
 1                    (Call to Order of the Court at 2:06:06 p.m.)

 2              DEPUTY CLERK:  All rise.  Her Honor, the Court, the

 3   United States District Court for the District of Alaska is now

 4   in session with the Honorable Deborah M. Smith presiding.

 5              Please be seated.

 6              Your Honor, we're on record in Case

 7   Number 3:14-CR-69-SLG-DMS, United States of America versus

 8   Boonchan Yang.

 9              Counsel, please identify yourselves for the record.

10              MR. COLLINS:  Stephan Collins, United States.

11              MS. STAFT:  Gretchen Staft on behalf of Mr. Yang.

12              THE COURT:  Thank you.  All right.  Ms. Staft, this

13   is your motion; correct?

14              MS. STAFT:  No, Your Honor.  We are here, I believe,

15   on a continued evidentiary hearing.

16              THE COURT:  That's right.  I'm sorry.  I tried to get

17   in to listen to where we were, and my FTR is not working today.

18   So Mr. Collins, you have another witness to present.

19              MR. COLLINS:  Your Honor, when we -- may I remain

20   seated because of the --

21              THE COURT:  Yes, you can.

22              MR. COLLINS:  Thank you.  We had not excused, passed

23   Officer Schmidt, but we do now.  So our next witness will be

24   Dr. Kabulski.

25              THE COURT:  Okay.  Cross examination, Ms. Staft?
```

```
 1            MS. STAFF:  Your Honor, I believe that I had
 2  completed cross examination of Probation Officer Schmidt at the
 3  time of -- that we ended the last hearing.  So no further
 4  questions.  Thank you.
 5            THE COURT:  Okay.  So you want to call your next
 6  witness, Mr. Collins?
 7            MR. COLLINS:  Yes, Dr. Kabulski.
 8            THE COURT:  All right.
 9            DEPUTY CLERK:  Mr. Kabulski --
10            DR. KABULSKI:  Yes, I'm here.
11            DEPUTY CLERK:   -- please raise your right hand.
12            (Oath administered to the witness)
13            DEPUTY CLERK:  For the record, please state and spell
14  your full name.
15            THE WITNESS:  It's Jarod Kabulski, J-A-B-U-L-S-K-I
16  (as spoken).
17            DEPUTY CLERK:  Thank you.
18            THE COURT:  Mr. Collins?
19            MR. COLLINS:  Thank you, Your Honor.
20              JARED KABULSKI, GOVERNMENT WITNESS, SWORN
21                        DIRECT EXAMINATION
22  BY MR. COLLINS:
23  Q    Dr. Kabulski, for whom do you work?
24  A    I work for Clinical Reference Laboratory in Lenexa,
25  Kansas.
```

1   Q    And for how long have you done that?

2   A    I have been with Clinical Reference Laboratory for over

3   five years.

4   Q    And what is it that the laboratory does?

5   A    We are a workplace and forensic drug testing laboratory.

6   Q    In addition to the five years that you have had with them,

7   do you have any prior experience in that field?

8   A    Yes, I have ten -- over ten years of experience in

9   forensics toxicology, both through drug testing and therapeutic

10  drug monitoring.

11  Q    And what -- what is the -- what is your educational

12  background that allows you to fulfill this function?  What did

13  you do to get your doctorate, I guess is another way of putting

14  it?

15  A    I -- I have my doctorate in pharmaceutical and

16  pharmacological sciences.  I'm also a board-certified forensic

17  toxicologist through the American Board of Forensic Toxicology.

18  Q    Have you ever testified before in any United States

19  District Court within the District of Alaska?

20  A    I have not in Alaska.

21  Q    Elsewhere?

22  A    Yes.

23  Q    Where would that be?

24  A    Pennsylvania, Texas are the ones that come to mind, most

25  recently.

1   Q    Are you familiar with -- I believe it's PharmChek?

2   A    Yes.  Yes.

3   Q    And what --

4   A    They are -- they are who provide the sweat patches to us,

5   and then we provide the -- the testing for those patches.

6   Q    Is it part of the same company or -- or is your laboratory

7   an independent entity from PharmChek?

8   A    Yes, we are.

9   Q    All right.  Is there any business relationship, other than

10  contractual?  Like ownership?

11  A    No, the only business relationship is that they contract

12  their drug testing through Clinical Reference Laboratory.

13  Q    The -- the laboratory for whom you work, does it provide

14  services to the United States Probation Offices throughout the

15  country?

16  A    Yes, we do have multiple clients that use our drug

17  testing.

18  Q    Does that include the District of Alaska?

19  A    I believe it does, yes.

20  Q    And are you personally and professionally familiar with

21  the methodology or the protocol that your laboratory follows

22  when analyzing sweat patches?  And am I correct that "sweat

23  patches" is an acceptable descriptor or is there another --

24  A    That is correct.  I will use the word "sweat patch".  I'm

25  part of -- both trained in the testing of the sweat patch for

1   the initial testing, which is the screening, as well as the

2   confirmation testing.  I oversee the certification department,

3   which is the group that's responsible for reviewing all drug

4   testing results before they're released for the clients.

5   Q    And what are -- what -- if you would, please, what is the

6   process that your laboratory over which you supervise follows

7   when it receives a sweat patch from a United States Probation

8   Office?

9   A    For the sweat patches, everything that we do at Clinical

10  Reference Laboratory follows chain of custody.  So we document

11  every transfer and every handling of that sample from process,

12  from the moment it arrives at CRL, or Clinical Reference

13  Laboratory, through all of the different phases of testing and

14  then through reporting.  The procedures that we use for sweat

15  patch drug testing is we first process the sample through an

16  initial screen.  That is an ELISA technology which looks for

17  classes of drugs.  If that were to screen positive, we use a

18  secondary method, which is LC MS MS testing, and from there, we

19  identify the individual drugs and the quantity of drugs based

20  on the cut-offs that are determined by PharmChem.

21  Q    In addition to doing the chemical analysis that you just

22  described, is there any inspection of the sweat patches to

23  determine whether or not that they are -- if I say -- valid for

24  testing?

25  A    There is an inspection process by the -- the collector, I

1    believe in this case the probation officer, who is applying and

2    removing the patch.  As far as an internal inspection, we do

3    have criteria -- if the patch arrives without the paperwork, if

4    the patchwork should arrive with the adhesive still on it, or

5    it was to be in a state that could have exposed it during the

6    transport process, we would not test that.  That would be

7    considered rejected for testing.  That's the criteria we use

8    before testing any sweat patch samples.

9    Q    What would render a sweat patch, I guess -- just trying to

10   think -- improper or invalid for subsequent chemical analysis?

11   What kind of physical tampering would you look for?

12   A    The only physical tampering that we look for is if the

13   tape, the protective layer that is placed on the patch, is

14   still on the patch when it arrives.

15   Q    What -- what assures you, as -- and your company, your

16   laboratory, that the sample that you've received, the sweat

17   patch you received, has not been exposed externally,

18   environmentally to any substance for which you're testing?

19   A    I can only speak to the analytical testing of the sweat

20   patch.  I can only speak to what was determined to be found on

21   the patch when it arrives, or after it arrives and we process

22   through the testing.  There is a process that the collector is

23   required to follow to prevent that contamination, but I can

24   only speak to what we were able to do once it is in our

25   possession.

KABULSKI - DIRECT

1  Q    So is it fair to say that if, upon receipt of a sweat

2  patch, unless you see something that evidences external damage

3  or some environmental damage to the sweat patch, it -- it is

4  ready, unless (indiscernible - garbled speech) it is ready for

5  analysis?

6  A    That is correct.  And once it is in our possession, it is

7  through the (indiscernible - garbled speech) process where it

8  is put into an individual tube.  That tube is then capped and

9  every uncapping of that sample is tracked through the process

10 to minimize any potential external contamination from within

11 the laboratory, which is highly unlikely.

12 Q    And are you familiar with the analyses that your

13 laboratory conducts on each sweat patch, the process?

14 A    Yes, both the screening processes, as well as the

15 confirmation or the LC process of confirming the results.

16 Q    On that latter, what is the confirmation process?

17 A    So the confirmation process uses liquid chromatography

18 mass spec mass spec, referred to as LC MS MS.  This is the gold

19 standard for drug testing.  The technology essentially is able

20 to identify specific drugs, as well as eliminate the potential

21 of interferences or interfering compounds that could

22 potentially look like the drug that is trying to be identified

23 in the assay.

24 Q    In regards to, for instance, methamphetamine, what does --

25 what is -- what are the steps of your analysis of each sample

1  you receive?

2  A    So for methamphetamine, once the sample arrives at CRL,

3  it's placed in the tube.  From there, it's accessioned.  All of

4  the information that arrives on the chain of custody, or the

5  CCF, is documented.  We then apply an internal LAN, or lab

6  accessioning number to that sample.  From there, it's

7  transferred to our initial testing and screening process.

8          In there, it is -- a buffer is applied to the tube.

9  The application of that buffer is to extract or remove any

10  potential drugs from that patch.

11          After the extraction process, that -- what we refer

12  to as a -- an aliquot, is moved to the ELISA testing area, and

13  the ELISA testing area, what we're looking for is the different

14  classes of drugs.  So it would run through a specific assay

15  looking for methamphetamine or amphetamine.  In the event that

16  it would screen positive for an amphetamine or methamphetamine,

17  it's then transferred to a different department, the LC or the

18  confirmation department.  From there, that sample is processed

19  through the mass specs to determine if that is a true positive.

20          In the event that we did not find methamphetamine or

21  amphetamine, it would be reported as a negative.

22  Q    And just to be clear, when you are analyzing the sweat

23  patch, you're not analyzing for the presence of

24  methamphetamine, itself; is that correct?

25  A    The sweat patch?

1  Q    Yes.  Are you analyzing it to determine if there's

2  methamphetamine on the sweat patch or the metabolite for

3  methamphetamine?

4  A    We're looking for both.  So in order to report a positive

5  methamphetamine, we will find methamphetamine.  There also

6  needs to be the presence of amphetamine.  Amphetamine is the

7  metabolite of methamphetamine.  So our body naturally breaks

8  methamphetamine down into amphetamine.  The reason that we

9  report a positive methamphetamine in the presence of

10 amphetamine is it shows that the human body converted this

11 methamphetamine to amphetamine in the absence of, say, a

12 prescription of Adderall.  Adderall could potentially show

13 positive for -- Adderall will show a positive for amphetamine.

14 Q    But not for methamphetamine; is that correct?

15 A    But not for methamphetamine; you are correct.

16 Q    So in order for you to make a conclusive determination on

17 whether or not the sweat patch has tested positive for

18 methamphetamine, you also look for the presence of amphetamine;

19 correct?

20 A    That is correct.  And in the LC technology, we are able to

21 differentiate and separate those two different drugs, so that

22 way, they are run on the machine or the instrument at the same

23 time, but they're not interfering compounds.  We do see them as

24 separate peaks or separate chromatograms.

25 Q    So is it possible to have a sweat patch show positive for

1  methamphetamine without the presence of amphetamine?

2  A    It is possible, but it would be reported as a negative,

3  because our criteria requires the presence of amphetamine to

4  report a positive methamphetamine.

5  Q    And just briefly, if you would, please, explain how the

6  sweat patch works.

7  A    The -- in general, description of how the sweat patch

8  works, if the human body consumes, in this example,

9  methamphetamine, methamphetamine is ingested by different

10 routes.  Once it is in the bloodstream, from the blood it then

11 can get transferred into the skin or into the sweat.  The sweat

12 patch, then, will absorb the sweat.  Once it is locked or

13 sealed in the sweat patch, we are able to then extract it later

14 in the process.  So it is just an absorption of sweat into

15 the -- the patch material.

16 Q    And in that regard, it's -- it's essentially a one-way

17 transfer?  It's -- for instance, if someone consumed

18 methamphetamines, thereafter sweat -- sweated, and the patch

19 absorbed it, what was absorbed into the patch is not thereafter

20 reabsorbed into the body; is that correct?

21 A    That is correct.  There's also a protective layer that's

22 piece -- I'm sorry.  There's also a protective layer that's

23 placed over the sweat patch.  This is to prevent any external

24 contaminants from getting into the patch also.  Therefore, the

25 presence of drugs in the patch would be from the sweat that was

1    collected under the patch.

2    Q    In regards to heroin, is there anything, for instance,

3    similar to the process for the detection of methamphetamine?

4    By that I mean, what do you analyze or how do you analyze and

5    come to the conclusion that heroin was present?

6    A    So heroin is actually Diacetylmorphine.  What we are

7    looking for is 6-Monoacetylmorphine, so same as the

8    methamphetamine.  Methamphetamine looks for the presence of

9    amphetamine and methamphetamine.

10          In these cases, we are only looking for 6-AM, or

11    6-Acetylmorphine.  That is the metabolite of heroin, and would

12    only be present in the fact of the body converting heroin or

13    Diacetylmorphine to 6-Monoacetylmorphine.

14    Q    And, sorry, I'm out of order in this regard, but when you

15    receive a sweat patch that, upon inspection, looks to have been

16    corrupted so that you cannot do an analysis, do you report that

17    back to the sender, the United States Probation Office, that it

18    arrived in a condition that you could not test or would not

19    test?

20    A    Yes, they would receive that as a rejected for testing.

21    Q    So unless there's a specific rejection for testing, we may

22    safely conclude that it was not tampered with, so to speak, and

23    that it was subjected to testing?

24    A    That is correct.

25    Q    And I apologize for asking at this late phase, did my

1   office forward you the six laboratory reports in --

2   A    Yes, I do have those reports.

3           MR. COLLINS:  And would you -- and if I may, Your

4   Honor, I assume that the Court received the ones we filed?

5           THE COURT:  Yes.

6   BY MR. COLLINS:

7   Q    If you would, Doctor, please take a look at Exhibits 1

8   through 6 and familiarize yourself, and when you are

9   comfortable, please just indicate, and then I will ask you some

10  questions.

11  A    I've already reviewed the documents and I'm free to

12  discuss them now if you're ready.

13  Q    Yes, please.  So with regard to Exhibit 1, which it was a

14  laboratory report from July 22nd, do you have that in front of

15  you, Exhibit 1?

16  A    Correct.  If you don't mind, can I give you an

17  identification number to show that we're on the same document?

18  Q    Sure.

19  A    It would start with the letter P.  It is P0619274.

20  Q    And that document that you've just described, is that

21  consistent with the document, or the chain of custody documents

22  and laboratory analysis that your laboratory prepares and

23  reports back to the United States Probation Office?

24  A    That is correct.  I have here the chain of custody and I

25  also have our report from CRL.

1  Q    Is there anything on the report that causes you to

2  question the conclusions that are set forth in there?

3  A    The conclusions of the report of the findings at CRL, no.

4  I'm confident in the results.

5  Q    And that applies to the same for the exhibits -- well,

6  you -- if you wish to identify them to make consistent, please

7  go ahead, but that would be Exhibits 2 through 6, with dates of

8  July 29th, August 6th, August 31st, September 8th, and

9  September 18?

10  A    That is correct.  I have reviewed those documents, and

11  they meet the criteria for CRL's reporting.

12  Q    And in those reports where it reflects the positive for

13  methamphetamine, is the presence of amphetamine noted?

14  A    Yes.  Yes.  There is methamphetamine and it's reported as

15  amphetamine present.  In one of the examples, there is a

16  quantitative value for amphetamine.  What that means is for the

17  cut-off for amphetamine it's 10 nanograms.  The presence of

18  amphetamine is between 9.9 and 2 nanograms.  To report a

19  methamphetamine as positive, we require the presence of

20  amphetamine down to 2 nanograms.

21          For an amphetamine-only positive, we would need to

22  have it a minimum of 10 nanograms.

23  Q    And to which report are you referring, making that

24  specific notation?

25  A    Nine eighteen, the last one that ends in 8123.

1   Q    And just to be clear, the laboratory reports that you're

2   referring to relate to an individual by the name of Boonchan

3   Yang; correct?

4   A    That is correct.

5   Q    In regards to any -- the presence of any other controlled

6   substance, do you have any concerns about the accuracy of the

7   reports?

8   A    No, I do not.

9          MR. COLLINS:  At this time, I have no other questions

10  of this witness, Your Honor.

11         THE COURT:  Cross examination?

12         MS. STAFT:  Thank you, Your Honor.

13         Good afternoon, Dr. Kabulski.

14                        CROSS EXAMINATION

15  BY MS. STAFT:

16  Q    I'd like to turn back to your discussion about inspecting

17  for possible tampering of patches when you -- when you receive

18  them in your lab.

19  A    That's correct, yes.

20  Q    So you testified that if any adhesive is still attached to

21  the patch, that that could -- that that could indicate

22  tampering?

23  A    Not that it indicates tampering.  It just means that it

24  wasn't a collection that we would continue testing.  It's part

25  of our standing operating procedure that if the tape still

1    arrives on the patch, that we reject that sample for testing.

2    Q    Okay.  And why is that?

3    A    It's -- it's been established by our directors and

4    responsible persons.  It's also part of the criteria that comes

5    from PharmChem.

6    Q    Okay.  And -- but why is it determined to be, you know,

7    potentially unreliable if it has the tape still on the patch?

8    A    I'm unable to answer that question.

9    Q    And at the time that you received the patch, you can only

10   determine if the -- if the patch appears to have been tampered

11   with or exposed, essentially in transport; correct?

12   A    Correct.

13   Q    So you have no way of determining whether the patch could

14   have been contaminated or tampered with prior to its arrival at

15   your lab?

16   A    That's correct.

17   Q    The -- the documents that are sent to your lab with the

18   patches for testing, do -- does that form include a question

19   of -- about tampering?

20   A    Yes, it does.  On the form, it's actually listed as

21   Number 16, "did the PharmChek appear to be tampered with or

22   compromised".

23   Q    And again, why is that -- that question important or

24   significant to -- to the lab?

25   A    It is not significant to the lab.  In the event that that

1   is marked yes or no, we still proceed with testing, as long as

2   there is not tape still on the sample.

3   Q    So -- so the lab will still test something that could have

4   potentially been tampered with or compromised?

5   A    I can't speak to if it has been tampered or compromised

6   with.  I can only speak to that the collector documented on

7   here their observation of the state of the patch when it was

8   removed.

9   Q    And likewise, you will still test a patch if there is no

10  answer as to whether the patch appeared to be tampered or

11  compromised?

12  A    That is correct.

13  Q    And you'd mentioned, as well, that there were test -- that

14  there was a chain of custody documentation that is sent with

15  the patch; is that right?

16  A    That is correct.

17  Q    All right.  And if we could just take an example look at

18  Government's Exhibit Number 1, can you show us where on

19  Government's Exhibit 1 the chain of custody documentation

20  appears?

21  A    This entire document would be a chain of custody.

22  Q    Okay.  And so does this form indicate who -- who applied

23  the patch?

24  A    Yes, it does.  It has the -- it has the -- in Section 4 --

25  I apologize.

1              In Section 3, it has the observer name.

2    Q    Okay.  And that's the -- the -- is that the person that is

3    applying the patch?

4    A    That is the -- that is what I refer to as the collector.

5    Here it has Benjamin Schmidt.

6    Q    All right.  And what about the -- the person that removed

7    the patch, where is that indicated?

8    A    That is documented in Step 11 in the top right of the

9    document.  That has date removed, the observer's initials, and

10   the donor's initials.

11   Q    And where does it indicate who has packaged the -- the

12   sweat patch?

13   A    There is a -- there is a -- yes, in -- towards the bottom,

14   it has the person shipping, the air bill number, and the date

15   shipped.  That's where that would be documented.

16   Q    I'm sorry.  Where are you referring?

17   A    Can you see my form?  I apologize.

18   Q    I can --

19   A    It would be here.

20   Q     -- it up a little bit higher?  I don't see the -- okay.

21   Are we looking at -- so are you looking at Government's

22   Exhibit 1?

23   A    I -- I believe that I am.  I don't have anything listed as

24   Government's Exhibit Number 1.  I apologize.

25   Q    Let's, if I can -- I'll refer back to the sample ID, or

1   that you'd referred to before.  I'm looking at a -- a sample ID

2   of P0619274, and that is on the -- on the lab report.  That's

3   the first page of this three-page document that's -- is

4   Government's Exhibit 1.

5   A    And is -- is this a document that says Clinical Reference

6   Laboratory at the top?

7   Q    Correct.  Yes.

8   A    Yes, this is a report that only comes from Clinical

9   Reference Laboratory.  This is the results page.

10  Q    Oh, right.  And so turning to Page -- is that -- is that a

11  three-page document?

12  A    It is a one-page document from CRL.

13  Q    Okay.  Do you have in front of you the -- the --

14  essentially, the grouping of pages that constitute each of the

15  Government's exhibits?

16  A    I believe that I do.

17  Q    If I could -- why don't we do it this way, perhaps, at

18  the -- we were discussing the chain of custody form.  I am

19  currently looking at a chain of custody form where in Box 11,

20  it says "date removed 7/29/20".  Do you have that form?

21  A    Yes, I have that document.  Yes, I do.

22  Q    All right.  And -- and there, where does it indicate who

23  packaged the -- the sweat patch?

24  A    On this document, I don't see where it -- it documents

25  that.

1      THE COURT:  This is Judge Smith.  Could it be Box 21,

2  with the observer's certification at PharmChek removal?

3      THE WITNESS:  That would be who removed it.  That is

4  also the observer's signature.  So -- but it does not

5  specifically state in there anything related to the shipping or

6  packaging.

7      THE COURT:  Oh, okay.

8      THE WITNESS:  But right below that, there is a

9  section that says "person shipping, air bill number, and date

10  shipped, attention CRL tox setup."  It's my assumption that

11  where the person shipping that would have completed that part

12  of the document.

13  BY MS. STAFT:

14  Q    So I'm sorry, where does it say "person shipping, air

15  bill, and date shipped" on this form, the one that indicates

16  that it -- the patch was removed 7/29/20?

17  A    Number 21, it has -- or -- yes, the Number 21 has the

18  observer's signature.  Below that, there is another set of

19  boxes that says "person shipping".

20  Q    Okay.  All -- the form that I have in front of me does not

21  have that.

22      THE COURT:  Nor does mine.

23      MS. STAFT:  Yeah, it does not have that information.

24  BY MS. STAFT:

25  Q    So -- so you're saying that the form should include a -- a

1  box that indicates the person shipping the patch, the air bill

2  number, and the date shipped?

3  A    That is correct.

4        THE COURT:  Doctor, could you hold up your form so we

5  could see if it's the same as the form we're all looking at.

6        THE WITNESS:  Does that help?  I'm sorry.

7        THE COURT:  It does help, but it does also show that

8  we have different forms.

9        THE WITNESS:  Does -- on the right of your form, mine

10  says "Ply, send this copy to the lab with PharmChek specimen".

11  Does your document have different?  Because we might be looking

12  at a collector copy versus a donor copy.

13        THE COURT:  I think we may be, because the one I have

14  has a diagram of a specimen bag at 22.  23 is empty.  24 has a

15  little bar code.  25 is empty.  27 is similar to yours with

16  instructions to observer at the bottom.

17        THE WITNESS:  We do have different documents.

18        THE COURT:  Okay.

19        THE WITNESS:  This -- the document that I'm referring

20  to is what's received with the specimen.

21        THE COURT:  Okay.  So I think what we probably have

22  is what's kept, perhaps, at the Probation Office.

23        THE WITNESS:  Would you mind if I check my email

24  quickly to see if what was sent to me looks like the documents

25  you're looking at?

1          THE COURT:  That would be great, thank you, if you

2   would do that.  But I do think what we may have in Exhibit 1 is

3   what probation received -- kept, rather.

4          UNIDENTIFIED MALE SPEAKER:  Yeah, Your Honor, if I

5   may speak.  I think I am understanding.  So Probation keeps the

6   Ply 1 copy and the Ply 2 is sent to the laboratory, which I

7   believe is what the Doctor is referring to, is the second Ply

8   that we do not retain, that their office has, and it's a little

9   bit different than ours.

10          THE COURT:  Okay.  So Doctor, after you get finished

11   looking at your email, I'll ask you if you had -- what you held

12   up, if it was labeled Ply 2.

13          THE WITNESS:  That is correct; mine is labeled Ply 2.

14          THE COURT:  Okay.  And -- well, Ms. Staft, you may

15   want to ask what his Ply 2 of the date removed 7/29/20, sweat

16   patch removed 7/29/20 shows, as far as your question of who --

17          MS. STAFT:  Thank you.

18          THE COURT:   -- packaged it.

19          MS. STAFT:  Yes, Your Honor.  Your Honor -- or excuse

20   me.

21   BY MS. STAFT:

22   Q    Dr. Kabulski, so on the chain of custody form indicating a

23   removal date of 7/29/20, on your Ply 2 sheet that you have in

24   front of you, who does it indicate as the person shipping?

25   A    There is a blank box.  There is no one indicated on this

1    document.

2    Q    So it is unknown who shipped that?

3    A    That is correct.

4    Q    All right.  And what does it say for the air bill number?

5    A    That is also blank.

6    Q    And date shipped?

7    A    That is blank, as well.

8    Q    So the -- the -- essentially, the chain of custody

9    documentation here is incomplete?

10   A    Yes.  This document is incomplete.

11        MR. COLLINS:  If I may interject, that's as to the

12   document he is referring, not the one that was admitted, Your

13   Honor.

14        THE COURT:  Well, the one that was admitted has less

15   information than he just --

16        MR. COLLINS:  I understand, but he -- the one that

17   was admitted is a different form, it appears, Ply 1 versus

18   Ply 2.

19        THE COURT:  Well, let me ask this.  Is Ply -- do

20   these come together, Mr. Schmidt?  Are they like carbon copies?

21        OFFICER SCHMIDT:  Yes, Your Honor.  There -- I

22   believe there's three copies, and then we retain, I believe,

23   two of them, the first and the third Ply and then we send off

24   the second Ply.

25        THE COURT:  And does the third Ply have any more

1  information about who packaged this?

2          OFFICER SCHMIDT:  I cannot recall off the top of my

3  head specifically what's on the -- the third Ply.

4          THE COURT:  Hmm, okay.  So right now, we have no

5  chain of custody for Government's Exhibit 1.

6          Go ahead, Ms. Staft.

7          MS. STAFT:  Thank you, Your Honor.

8  BY MS. STAFT:

9  Q    And Doctor, if we could turn to next Government's

10 Exhibit 2.  This starts with a sample ID of P0614191?

11 A    Yes, I have that document.  Mine is also still Ply 2.

12 Q    Okay; all right, yes.  Turning to the third page, the

13 chain of custody documentation, I'm looking at a -- a chain of

14 custody form that indicates a removal date of 8/6/2020.  Is

15 that the same form that you're referring to?

16 A    Yes, that is the same form.

17 Q    All right.  And turning to the -- the shipping

18 information, what does it indicate for the person shipping this

19 specimen?

20 A    This one is blank.

21 Q    And air bill number?

22 A    It is blank also.

23 Q    And date shipped?

24 A    It is also blank.

25 Q    And is that consistent with the -- the Ply 2 that you have

1    regarding -- you know, that your lab kept as its own records

2    regarding the sample?

3    A    Yes, yes.

4    Q    So your lab accepted this sample, as well, for testing

5    with incomplete chain of custody documentation?

6    A    That is correct.

7    Q    Turning next to Government's Exhibit 3, looking at a

8    sample ID of P0620012, turning to the chain of custody

9    documentation, looking at a removal date of 8/14/20, do you

10   have that in front of you?

11   A    Yes, I do.

12   Q    All right.  So our -- what we received here is a Ply 1,

13   which does not contain the -- the shipping information box

14   that -- that we have in the previous exhibit.  But do you have

15   the Ply 2?

16   A    Yes, I do.

17   Q    Okay.  And is the person shipping that specimen

18   identified?

19   A    That's also blank.

20   Q    Waybill -- or excuse me, air bill --

21   A    Blank.

22   Q    -- number?

23   A    It's blank.

24   Q    And date shipped?

25   A    That is also blank.

1   Q    Turning next to Government's Exhibit 4, looking at a

2   sample ID of P0630070, and on the chain of custody form, a

3   removal date of 9/8/20, again --

4   A    Yes, I have that document.

5   Q    Again, the documentation that we have in front of us here

6   in court is from -- is Ply 1, which does not have the shipping

7   information.  Do you have Ply 2?

8   A    I do have Ply 2.

9   Q    And is the person shipping the specimen identified there?

10  A    No, that is blank.

11  Q    And air bill number?

12  A    It is blank.

13  Q    And date shipped?

14  A    It is blank also.

15  Q    Turning next to Government's Exhibit 5, looking at a

16  sample ID of P635309, turning to the last page -- well, we've

17  been referring to -- do you have the -- the chain of custody

18  form for that sample number that I just identified in front of

19  you?

20  A    Yes, I have -- yes, the collection chain of custody form,

21  I do have that.

22  Q    Okay.  And so we've actually -- we've been referring, as

23  well, to these as -- by the date removed.  Does this chain of

24  custody form indicate a date removed?

25  A    Nope.  This date removed is blank.

1  Q     Okay.  And again, our exhibit is Ply 1.  It does not have

2  the shipping information.  Do you have Ply 2 there in front of

3  you?

4  A     Yes, I do.

5  Q     All right.  And what does it indicate for the person

6  shipping the sample?

7  A     It is blank.

8  Q     And the air bill number?

9  A     It is blank.

10  Q     And date shipped?

11  A     It is also blank.

12  Q     And the last --

13  A     I -- go ahead.  I'm sorry.  I apologize.

14  Q     Turning to Government's Exhibit 6 --

15  A     Yes.

16  Q     -- a sample ID of P0638123?

17  A     Yes.

18  Q     And on the chain of custody form, removal date of 9/29/20?

19  A     Yes.

20  Q     We just have Ply 1.  Do you have Ply 1 in front of you?

21  A     I have Ply 2 in front of me.

22  Q     Thank you, okay.  And what does it indicate for the person

23  shipping?

24  A     It is blank.

25  Q     Air bill number?

1   A    The air bill number is blank, and will be blank on all

2   documents.  These are shipped by U.S. mail.

3   Q    And what does -- well, I'll come back around to that.

4   Does it have -- does it indicate a date shipped?

5   A    Okay.  No, it does not indicate a date shipped either.

6   Q    Okay.  So is there -- should there be a -- an indication

7   on the form of -- if it was shipped by U.S. mail, would there

8   be a tracking number indicated on this form?

9   A    The only documentation that CRL uses with this form is

10  below that where it says "lab" and that is where we have our

11  specimen received, date received, seals intact, and that the

12  labels match.  So in accordance with this document, it -- it

13  does not have anything that indicates that it is shipped by the

14  U.S. Postal Service.

15  Q    All right.  And there's no tracking information or any

16  sort of package number associated or indicated on this form?

17  A    That is correct.

18  Q    Okay.  And in any event, it's not identified who -- who

19  has shipped the -- the package; correct?

20  A    That is correct.

21  Q    Okay.  And that is true of each of the Ply 2 chain of

22  custody forms that we have reviewed today; correct?

23  A    That is correct.

24         MS. STAFT:  If I could have just a moment, Your

25  Honor.

1          (Pause)

2    BY MS. STAFT:

3    Q    And -- one moment, I have to locate the specific sheet.

4         If we could turn back to Government's Exhibit 4,

5    looking at a -- the chain of custody documentation with the

6    removal date of 9/8/20, this -- this form indicates on

7    Government's Exhibit 4 that the -- that the patch did appear to

8    be tampered with or compromised; is that correct?

9    A    The collector noted here that the patch was broken up and

10   the adhesive seemed to be peeled, and they marked "yes".

11   Q    And that's of no significance to your lab?

12   A    We still test the patch, regardless of what is documented

13   there.

14   Q    Okay.  Do you do any additional inspection of the patch if

15   it is -- if something like this is indicated?

16   A    We do not.

17         MS. STAFT:  Your Honor, I don't think I have any

18   other questions at this time.

19         THE COURT:  All right.  Thank you.

20         Redirect?

21         MR. COLLINS:  Your Honor, if I may approach, I have a

22   blank, so to speak, form that -- the PharmChek form that the

23   United States Probation Office uses, and as an example, I've

24   provided Ms. Staft with a similar -- it's a three-part

25   document, that we are learning.

1          THE COURT:  You may approach.  Thank you.

2                     REDIRECT EXAMINATION

3   BY MR. COLLINS:

4   Q    Dr. Kabulski, I hate to ask if you have any of these in

5   your -- or if you have any of these forms, but the blank -- I

6   don't think you can see it, the --

7   A    I can see it, and I do not have any of those documents.

8   Q    Are you familiar with the documents, though?

9   A    I am only familiar with Ply 2.

10  Q    Ply 2.  Is it fair to say that Ply 2 indicates that

11  there's at least two documents, Ply 1 and Ply 2?

12  A    That is correct.

13  Q    And would it surprise you that there's also a third copy

14  called -- or referenced Ply 3?

15  A    Yes.

16  Q    It would surprise you that there's a third page?

17  A    Well, I -- I was unaware that this was a Ply 2 copy.  In

18  the federal documents, which this is not a federal document,

19  this is not a SAMHSA approved federal form.  Sweat is not a

20  regulated or a federal (indiscernible - garbled speech) that

21  can be tested.  Those documents contain a five-part form.  That

22  five-part form is a lab copy, an MRO copy, a donor copy, an

23  employer copy, and then a collector copy.  So based off of what

24  I use for a federal urine test, this having multiple parts does

25  not surprise me.

1  Q    And is it fair to say that you are not personally familiar

2  with the PharmChek three-part form that the United States

3  Probation Office for the District of Alaska uses; is that

4  correct?

5  A    That is correct.

6  Q    Nonetheless, in regards to the chain of custody, if, as

7  you observed, there was a Ply 2 copy in your file, to which you

8  were referring -- am I correct you were referring to the Ply 2

9  copy?

10  A    That is -- that is correct.

11  Q    Not the -- the actual exhibit that we sent, but the Ply 2

12  copy?

13  A    No, I was referring to the lab copy.

14  Q    And that's the copy on the submission form, chain of

15  custody form, that your laboratory retains for its own records;

16  correct?

17  A    That is correct.

18  Q    Nonetheless, on the forms with which you're familiar, and

19  looking at the Ply 2 copies that you have in front of you, what

20  is -- is there a way to track the connection between these

21  various documents and the particular specimen that has been

22  sent?

23  A    Yes.  Documented on my Ply 2, which is the -- the lab

24  section, there is a "seal intact" box, which we are required to

25  check when we receive the sample.  That is to make sure that

1    the specimen was sealed and appropriately packaged.  There's

2    also a labels match.  What we are looking for with the labels

3    match, we are making sure that the specimen number that is on

4    this chain of custody matches the specimen number that is on

5    the patch provided.

6    Q    And in regards to the laboratory report, the separate

7    document that you prepare, is there a method of connecting your

8    report with these chain of custody documents?

9    A    Yes.  That can be -- can be connected to it through in the

10   middle where it says "slip ID", and you would have the -- what

11   is on the chain of custody or the collection chain of custody,

12   the specimen ID, and then there's also the sample ID in the top

13   right.  That is the number that we affix to the -- the tube or

14   the bottle that the sweat patch is transferred to, and also

15   attached to the front of the collector chain of custody.

16   Q    And so in regards to your Ply 2 documents that you have

17   there, to which you've been referring, each of those has a bar

18   code with a specimen number; correct?

19   A    Yes, there's a specimen number that is preprinted that

20   comes on the package, and there are two bar codes that are

21   applied at the time of the accessioning or the receipt of the

22   sample.

23   Q    And if -- answer this only if you know.  On these chain of

24   custody forms, are there stickers, labels, security labels

25   affixed that then are applied to the sample and its packaging

1  during the process?

2  A    I'm unable to answer that question.

3  Q    So in regards to the Ply 2 copy where it does -- it has

4  boxes indicating person shipping, air bill number, date

5  shipped, that is not necessarily going to be filled out on your

6  Ply 2 copy, correct, by your staff?

7  A    That is not filled out by my staff.

8  Q    And that is filled out by the sender?

9  A    I would assume that is filled out by the sender.

10          MR. COLLINS:  I have no other questions of this

11  witness, Your Honor, at this time.

12          THE COURT:  I have a question.  If I'm understanding

13  you correctly, Doctor -- this is Judge Smith -- those little --

14  in looking at this that's been provided, and I don't know if

15  you can see it -- probably not -- but there are these little

16  bar codes, three of them.  It looks like --

17          THE WITNESS:  Yes, I can see those.

18          THE COURT:   -- it goes over the top of the specimen

19  bag, the security seal, and then one goes on, I guess, the

20  sample, and one stays --

21          THE WITNESS:  Yes.

22          THE COURT:   -- on this document.  Okay.  So when I

23  look at Exhibit 1, and I look at your test results, I see that

24  slip ID that matches the security seal on Ply 1 for the patch

25  removed 7/29/20, and they match.  When I look at Government's

Exhibit 2, Government Exhibit 2 has a Ply 2, and so it looks
like that security seal that's just sort of plunked down in two
different cases was P0614191, which does not match the slip ID
on the front of the test.  Can you --

THE WITNESS:  Your Honor --

THE COURT:  Yeah, what can you tell me about that?

THE WITNESS:  Yes, I apologize.  The number that
starts -- or the bar code that starts with the "P", that isn't
applied to the paperwork until it is received at CRL.  That's
an internal LAN number.  That's a lab accessioning number.  So
we have two levels of identification.  We have the specimen
number on this, which starts with a "7" that is part of the
original documentation.  When it is received, we then apply our
own tracking bar codes, and in this case, those are labeled
with a "P" for "patch".

THE COURT:  Okay.  Thank you.  So -- and then I see
on the -- right underneath that "P, patch" Ply 2 for
Government's Exhibit 2, there is a slip ID number, 7614227,
looks like perhaps 68, which does match the slip ID on the
report for Government's Exhibit 2.

THE WITNESS:  Yes.

THE COURT:  So it's when the slip ID is matched that
you -- your business feels comfortable that the chain of
custody has been respected; is that -- am I understanding you
correctly?

1          THE WITNESS:  That is -- that is correct.  If the

2   paperwork listed on here as the specimen number, if that

3   number, starting with the 7, contains the same seal on the

4   patch that arrives, that would start with that same "7", that

5   is acceptable for us to test.

6          THE COURT:  All right.  I'm looking through them all

7   to see --

8          THE WITNESS:  Also --

9          THE COURT:  Go ahead.

10          THE WITNESS:  Your Honor, also, where it says -- on

11   mine it has "seal intact" which is documented.  That means that

12   that same number was correctly applied to the shipping

13   container, that it was sealed during the collection process.

14   And I believe that that is documented in Step 20, where the

15   donor signs and initials.

16          THE COURT:  Step 20?

17          MR. COLLINS:  It's on the front page.

18          THE COURT:  Okay.  So that's where the donor says, "I

19   certify the specimen container was sealed with a tamper-proof

20   seal in my presence, and that the information on this form and

21   on the label is correct"?

22          THE WITNESS:  That is correct.

23          THE COURT:  Okay; all right.  Thank you.  Let me

24   double-check these other slip IDs.

25          Okay.  And regarding that one Government's Exhibit 4,

1   where the -- the person who removed the patch checked the box

2   that it had been tampered with and appeared that the patch was

3   broken up and adhesive seemed to be peeled, are those

4   conditions, a patch being broken up and adhesive being peeled,

5   those -- would those affect the accuracy of the test result?

6           THE WITNESS:  It would not affect the accuracy.  When

7   the patch is removed, because of the adhesive that goes on

8   there and the removal process, and based on the hygiene of the

9   donor, they can come in a state of -- in disarray, or pieces.

10          THE COURT:  Okay.  Moving back to Government's

11  Exhibit 1, I see a positive for methamphetamine, comma, sweat,

12  and positive for opiates, comma, sweat.  And then I see the

13  amphetamine cut-off value that -- between 2.0 to 9.9

14  NG/milliliter was present.  Is there any place on this form

15  that tells me that there were opiates, metabolites for opiates

16  present?

17          THE WITNESS:  Your Honor, is that sample ID that ends

18  in 0070?

19          THE COURT:  Let's see, the sample ID --

20          THE WITNESS:  Oh, I'm -- that is not correct.  I'm

21  sorry.

22          THE COURT:  Yeah, I'm looking at the one with the

23  slip ID, X761422782, Government's Exhibit 1.

24          THE WITNESS:  Yes.  I have that right in front of me.

25  I apologize.

```
 1              THE COURT:  No, that's fine.

 2              THE WITNESS:  So under initial test, we have -- that

 3   is the screening, it says opiates and sweat.  And then in the

 4   confirmation, it has MS, morphine sweat.  Morphine is part of

 5   the opiate family.  The opiate family contains morphine,

 6   codeine, 6-AM, Hydrocodone, hydromorphone, oxycodone, and

 7   oxymorphone.

 8   Q    So is the morphine a metabolite of opiates?

 9   A    Morphine is an opiate.

10   Q    Okay.  But my question is -- I understand -- if I

11   understand -- well, first let me make sure I understand this.

12              Under "confirmation", when you have this information

13   about the amphetamine cut-off value, is that where you find

14   whether there was an amphetamine metabolite present?

15   A    I apologize, Your Honor.  Amphetamine is listed here, and

16   methamphetamine.  They are run as separate screens.  So while

17   the methamphetamine screen is looking for specifically

18   methamphetamine, specifically d-methamphetamine, which is the

19   street or the illegal version of methamphetamine, the

20   amphetamine is more designed as a screen for just the

21   amphetamine drug.

22              So as we move into the confirmation, there is an

23   amphetamine result which relates to the amphetamine -- it

24   actually relates to the methamphetamine screen, because the

25   methamphetamine is what triggers the presence of that
```

1    amphetamine.

2           For the opiates, morphine is part of the opiate

3    class, which is why it says, "opiates, sweat positive", and

4    then down further, it says "morphine".  But on this document,

5    it does not list it as a class, and then below that, the

6    specific drugs that are in that class, which I see now is

7    confusing.

8           If it were to be presented that way, it would say,

9    "opiates positive", and below that, it would say "MS morphine

10   sweat 40 positive", and that would show that the opiate that we

11   found in the confirmation testing was morphine.

12           THE COURT:  Okay.  But my understanding from perhaps

13   some other cases was that if a defendant, for example, came in

14   and said, "I was around people who were using meth but I didn't

15   use meth.  If I got something on my patch, it was that meth,

16   because somebody with meth on their hands touched me or

17   something, but I did not put any meth in my mouth."

18           And what I understood the answer to that to be was if

19   there are the metabolites of methamphetamine present, you know

20   that person has, in fact, ingested methamphetamine and their

21   body has processed it.  Would you agree with that?

22           THE WITNESS:  You are correct.  I do agree.  You are

23   correct.

24           THE COURT:  All right.  Now previously, I had the

25   understanding that this indication of methamphetamine in the

1  confirmation test was a confirmation of a metabolite of

2  methamphetamine; is that correct?

3         THE WITNESS:  That is correct, yes.

4         THE COURT:  All right.  So then that's my question.

5  Is the morphine a metabolite of opiates and indication that

6  someone just didn't get somehow opiates on their patch when

7  they didn't, in fact, ingest any?

8         THE WITNESS:  The -- the metabolite of morphine is

9  actually more -- is Morphine-3-glucuronide.  That is a process

10  that the body does.  It adds a glucuronide or adds a chemical

11  that makes it more polar so that way it can be absorbed into

12  the urine.

13         For a sweat, it's the parent drug that is excreted in

14  our sweat.  So the reason that we are only seeing morphine and

15  not the metabolite of morphine is that because morphine is

16  traveling through the blood, it is then what is absorbed into

17  the sweat patch.

18         THE COURT:  Okay.  So -- but it -- does the presence

19  of morphine indicate that a person ingested opiates?

20         THE WITNESS:  No, it does not.

21         THE COURT:  So somebody could, with morphine on their

22  hands, could contaminant a patch if --

23         THE WITNESS:  If the patch was not properly covered

24  or was exposed, there would be potentially morphine.

25         THE COURT:  Okay.  So if I understand you correctly,

1  with this Page 1 of the report, there isn't a place that --

2  that establishes the presence of an opiate metabolite?

3          THE WITNESS:  In this example here for morphine, you

4  are correct.  In the patch -- or in the other documents that

5  have been provided, the 6-AM, or the 6-Acetylmorphine, those

6  would all be the same as the methamphetamine/amphetamine value.

7  The presence of 6-AM could only come from the ingestion of

8  heroin.

9          THE COURT:  Okay.  So all the other exhibits, 2

10  through 6, had the presence of the 6-AM, which is the

11  metabolite of opiates; am I understanding that correctly?

12          THE WITNESS:  Correct, correct.

13          THE COURT:  All right.  Thank you.  I have no further

14  questions.

15          THE WITNESS:  Thank you.

16          THE COURT:  Anything further, Ms. Staft?

17          MS. STAFT:  Your Honor, if I could just ask a couple

18  clarifying questions.

19                      RECROSS EXAMINATION

20  BY MS. STAFT:

21  Q    Doctor, you've indicated that the -- the -- say, on the

22  chain of custody form, if the tampering box is not -- is

23  checked as yes, that that doesn't affect your ability to -- to

24  test the patch; correct?

25  A    Correct.

1   Q    Meaning, it doesn't affect your ability to test the

2   substances on the patch as you received it?

3   A    Correct.

4   Q    It -- but that the -- your ability to test the patch as

5   you received it obviously does not exclude the possibility

6   of -- of earlier contamination prior to being received at the

7   lab; correct?

8   A    For the heroin or for the methamphetamine, that is

9   excluded, because those have the metabolite.  For the morphine,

10  you are correct.

11  Q    Well, so a -- so these patches aren't -- aren't DNA

12  tested; correct?

13  A    Correct.

14  Q    So -- so you're not able to tell if a -- a metabolite

15  present in the patch came from the sweat of -- of the wearer or

16  if it could have come from, potentially, the -- the sweat of

17  somebody else that had touched the patch; correct?

18  A    This would not be a touch transfer.  The metabolite at

19  these levels and the cut-off of 10 that is established for

20  these drugs is based on the minimum of a single use.  Trace

21  analysis would be below our cut-off -- or trace transfer, if I

22  just say it more correctly.

23  Q    So -- but you can't -- but again, you can't -- you don't

24  have a way of -- of testing -- of confirming through a DNA

25  analysis, whose -- whose sweat or metabolites you are testing;

1  correct?

2  A    You are correct.

3  Q    And going back to the chain of custody -- well actually,

4  could we just turn to Government's Exhibit 1.?  So I see on

5  Page 1 here, I'm looking at a sample ID P06197 -- or 274.  Just

6  below the sample ID, it has a collected date of 7/22/20; is

7  that right?

8  A    That is correct.

9  Q    Okay.  And what is the date received by your -- the sample

10 was received by your office or by your lab?

11 A    That is when it is received at Clinical Reference

12 Laboratory.

13 Q    So is that the date that it's received in the mail?  Is

14 that what you mean?

15 A    That is when it is received at the laboratory, yes.

16 That's when it is opened, it is accessioned, and it is started

17 through our testing process.

18 Q    All right.  And so --

19 A    It's when the sample ID would be applied.

20 Q    Okay.  What's the receive date indicated here?

21 A    8/25/2020.

22 Q    And what's the reason that -- so that's over a month after

23 the collected date.  What's the reason for that lapse in time?

24 A    I cannot comment.  It would only be speculation.

25 Q    So could that have been a -- a lapse in time from the --

1    could that have been a lapse in processing by your -- by your

2    lab?

3    A     No.  This -- when they are received at the laboratory,

4    they are processed within one or two days.  We do not process

5    samples on Sunday.  So if we were to receive something from the

6    U.S. mail on a Sunday, it would not be processed until Monday.

7    For every other day, it is processed same day.  It would be

8    considered received same day.

9    Q     Okay.  So -- so it may have been that there was a lag on

10   the -- on the collector's end that would account for the --

11   A     Yes.  It would be speculation, yes.

12   Q     But you have no way of knowing what happened to that

13   sample or where it was during that time?

14   A     You are correct.

15   Q     And likewise, who handled it?

16   A     You are correct.

17   Q     And -- and again, on this one, we don't know which -- what

18   date it was sent to your lab; correct?

19   A     No.  I only have a date removed.

20             MS. STAFT:  No further questions, Your Honor.

21             THE COURT:  I have a couple other questions,

22   Mr. Collins, before --

23             Doctor, when I look at Ply 1 on the sample form

24   that's been provided by the Government, Box Number 23 has

25   the -- what are we calling it -- the slip ID number with the

1    bar code, and underneath, it says "security seal PharmChem,

2    Inc.", then Box 24 has a repeat of the number and bar code, and

3    it gives the instruction, "place over top of the specimen bag".

4    And then Box 25 has a repeat again, and donor's initials and

5    observer's initials and date collected.

6          Do I understand correctly that this bottom of it that

7    says "security seal PharmChem, Inc.," has the number, "place

8    over top of specimen bag," and has the donor's initials, and

9    the observer's initials -- does that go over the top of the

10    bag, itself?

11          THE WITNESS: There is a small, plastic, see-through

12    container. It is a bag. The sweat patch is placed in that

13    bag. When it is closed and sealed, that seal is then placed

14    over the -- the overlap. So that way, it is sealed and

15    documented that that has been placed in there and that any

16    evidence of tampering with that would break that seal. And

17    then we would document that as, in the lab portion where it

18    says "seal intact", if that were broken before it arrived at

19    CRL.

20          THE COURT: Do I understand that both the donor's

21    initials, which would be in this case Mr. Yang, and the

22    observer's initials, which would be Mr. Schmidt, would have to

23    be on that seal to the bag for you all to test it?

24          THE WITNESS: That is correct.

25          THE COURT: All right. And where is it that you all

1    say on the form that that was the case?

2         THE WITNESS:  For the seals intact on Ply 2.

3         THE COURT:  On Ply 2.  Okay.  Could you look at all

4    of your Ply 2s for each of these tests and tell me if they say

5    the seals were intact?

6         THE WITNESS:  Would you like me to read which

7    specimen I'm looking at and then confirm, or just review all of

8    them and let you know if any of them do not have that.

9         THE COURT:  Actually, if it you could do it slip ID

10   by slip ID, that would be great.

11        THE WITNESS:  Slip ID 761422782, I have documented

12   here that the seal is intact.  761422768, I have documented

13   that seal is intact.  761557152, I have documented seal intact.

14   761557140, I have documented seal intact.  761557132, I have

15   documented seal intact.  761557098, I have documented seal

16   intact.  And that is all the documents I have.

17        THE COURT:  Okay.  And you read off six; is that

18   correct -- no, wait.  Did you read off 761557152?

19        THE WITNESS:  Yes, I -- I will read it again, but I

20   believe that I did.  761557152, and that is documented as

21   seal's intact.

22        THE COURT:  Okay; all right.  So on -- you've just

23   read off six Ply 2s with the seal intact on each of them?

24        THE WITNESS:  That is correct, Your Honor.

25        THE COURT:  Thank you.  All right.  I have no further

1    questions.

2          Mr. Collins?

3          MR. COLLINS:  Well, I -- I just have one.

4                    FURTHER DIRECT EXAMINATION

5    BY MR. COLLINS:

6    Q    The subject matter -- with regard to the shipper's

7    information that has become the topic of -- of focus on Ply 2

8    of this form, the information with regard to the ship -- the

9    method of shipment would come from the person -- or the

10   Probation Office who is shipping the sample; is that correct?

11   A    That is -- that is correct.

12   Q    And while you've mentioned that the United States Postal

13   Service was a shipper, you cannot confirm that, in fact, it was

14   exclusively the postal service who ships --

15   A    I cannot.  I cannot.  They are shipped by courier, postal

16   service, FedEx, UPS.

17          MR. COLLINS:  Thank you.  I have no other questions

18   of this witness, Your Honor.

19          THE COURT:  Doctor, one quick other question.  On

20   the -- I believe it was Exhibit 1, where there was a -- a month

21   delay in it being tested, how does that affect the validity of

22   the readings that you would receive.

23          THE WITNESS:  We have no criteria based on the amount

24   of time for shipping to be able to distinguish or understand

25   what that -- the validity or the potential degradation would

be.  It would be a degradation product.  In the event that it was not for this specific example, morphine, methamphetamine, or amphetamine, the breakdown of those would be into something that we would not be able to detect.

THE COURT:  Well, does that mean that this is not a reliable test result or does that mean the science means that it would be higher if it had come to you for testing earlier?

THE WITNESS:  It could potentially be higher.

THE COURT:  Could it potentially be -- could it potentially read positive when a person wasn't positive?

THE WITNESS:  No.

THE COURT:  All right.  Thank you.  I have no further questions.

Anything further, Ms. Staft?

MS. STAFT:  No, Your Honor.

THE COURT:  All right.  Thank you.  May this witness be excused?

MR. COLLINS:  Yes.  Thank you, Doctor.

THE COURT:  Thank you, Doctor.

THE WITNESS:  Thank you.

THE COURT:  You can figuratively step down.  Thank you.

(Witness excused)

AUTOMATED VOICE:  You have been disconnected from the meeting.

1          THE COURT:  Any other witnesses from the Government?

2          MR. COLLINS:  Your Honor, in regards to the form that

3    I provided sample copies --

4          THE COURT:  Yes.

5          MR. COLLINS:  -- from probation Officer Schmidt,

6    would you allow me to call him to authenticate them and have

7    this become a part of the -- if the Court so desires?

8          THE COURT:  Yes, I think that would be fine.  Do you

9    have any objection, Ms. Staft?

10          MS. STAFT:  No, Your Honor.

11          THE COURT:  Okay.  Mr. Schmidt can be re-called.

12    Since it's been over a month, Madam Clerk, I'll ask that you

13    re-administer the oath -- or approximately a little more than a

14    month -- little less than a month, I should say.

15          DEPUTY CLERK:  Please raise your right hand.

16          (Oath administered to the witness)

17          DEPUTY CLERK:  Please be seated.  For the record,

18    please state and spell your full name.

19          THE WITNESS:  Benjamin Schmidt, B-E-N-J-A-M-I-N,

20    S-C-H-M-I-D-T.

21          DEPUTY CLERK:  Thank you.

22          MR. COLLINS:  Your Honor, the -- the copies that I

23    provided counsel, as well as Your Honor, are unique in that

24    they have their own specimen ID number.  So the sample that I'm

25    going to hand him is not going to be identical in the specimen

1    ID numbers.  I'm just offering this as an illustrative example

2    of the forms that are used and I would mark this as Exhibit 7.

3              THE COURT:  All right.

4              MR. COLLINS:  I mean, the Court has a copy, if the

5    Court just wants to mark that as 7 and keep it, then.

6              THE COURT:  Well, why don't you mark the one that

7    you're going to actually use, and then provide that ID number.

8              BENJAMIN SCHMIDT, GOVERNMENT WITNESS, SWORN

9                          DIRECT EXAMINATION

10   BY MR. COLLINS:

11   Q    Officer Schmidt, you previously testified about completing

12   chain of custody forms for each of the six samples that you

13   submitted and previously testified about.  I have handed you

14   Exhibit Number 7, and do you recognize what that form generally

15   is?

16   A    Yes.

17   Q    And what is Exhibit 7?

18   A    It is a chain of custody that we complete when we apply

19   and remove sweat patches on individuals under supervision.

20   Q    And physically, what -- would you describe the nature of

21   the form?

22   A    It lists various items, such as the defendant's name who

23   we're applying the patch to, the indication of the sweat patch

24   number specifically assigned to that sweat patch, the dates

25   applied, dates removed, and signatures following the protocol

1    that's assessed on the form.

2    Q    Thank you for that, but I was actually being more basic.

3    In regards to physical nature of the form, is it -- when you --

4    A    Oh, I see.

5    Q    -- receive an original blank form, what does it consist

6    of?

7    A    So we typically get stacks.  There is two different types

8    that we get.  We get one specifically for people under a post

9    conviction, and pretrial.  The only difference is in that top

10   Number 1 reading, it will say "federal pretrial" instead of

11   "federal probation", and I believe that is for financial means.

12   They -- the agencies differentiate between probation and

13   pretrial.  But aside from that, it's typically -- there's a --

14   they're three-ply forms and then there's the kind of the edged

15   sides that we tear off to -- to send out.

16   Q    If I may, this is -- in its original form, looks like the

17   original computer paper?

18   A    Yeah, essentially.  It's a paper format.

19   Q    But the sides have a binding element with holes in it;

20   correct?

21   A    Correct.

22   Q    But if you were to tear off the binding, the holes with

23   the perforation, it would reveal that there are three forms,

24   each slightly different than the other, but all related to the

25   same specimen number; is that correct?

1  A    Correct.

2  Q    On the Ply -- and I'll refer to it as Ply 1, because that

3  seems to be the one that we were originally thinking that we

4  were dealing with -- what, in its uncompleted form,

5  distinguishes this Ply 1 from the other two, besides wording?

6  A    There are the stickers on the front portion in 23, 24, the

7  25, and 26 boxes, and those we apply to the bags, itself.

8  There are two individual bags that we utilize for shipment.

9  Q    So on the -- the initial form, there's an -- there are

10  actually four stickers; correct?

11  A    Correct.

12  Q    And there are three stickers with bar codes, as well as a

13  unique specimen number; correct?

14  A    Correct.

15  Q    And then that specimen -- unique specimen number also

16  appears on the bottom portion of that sticker, that reads

17  "security seal PharmChem, Inc., place over top of specimen bag,

18  PharmChek, donor's initial, observer's initial, date

19  collected"; is that correct?

20  A    Correct.

21  Q    The bottom portion of that sticker, where is that placed?

22  A    So there are two clear bags that we utilize.  That sticker

23  goes on the secondary bag.  So there's a smaller bag that gets

24  placed in that larger secondary bag, and that is when we apply

25  this security seal on that exterior bag.

1   Q    What's -- what happens to the bar code stickers that

2   appear to be below Sections 23, 24, 25?

3   A    So typically, one is applied to the initial larger bag,

4   and the second one is applied to the -- the smaller bag.

5   Q    Who completes these forms after a sweat patch has been

6   removed -- or during the process of removing -- or placing and

7   removing a sweat patch?

8   A    The left side of the paper is -- is filled out for whoever

9   is doing the application, and those are specific officers

10  trained in the sweat patch procedures.  The right side for the

11  removal, it could be a different officer, but they are also

12  trained in the -- the sweat patch procedures.

13  Q    The stickers that we were recently discussing, when are

14  those removed and applied to the plastic bags?

15  A    When the sweat patch is removed.

16  Q    So this is immediately before it's submitted for

17  laboratory analysis?

18  A    Correct.

19  Q    Once these stickers are removed, what's left on Ply 1?  Is

20  there anything beneath the sticker that's --

21  A    No.  It's -- it will be blank.  Essentially, if you were

22  to look at this document without the stickers, it would be a

23  blank patch in those in that area.

24  Q    What forms do you submit along with the sample?

25  A    Ply 2 is put inside the secondary bag, which then is

1    sealed with that security seal.  And that Ply 2 is sent off to

2    the lab.

3    Q    Within the sealed plastic bag?

4    A    Within, yes.  It's not in the bag with the patch, itself.

5    That has -- there's nothing sealed in with that patch.  It has

6    its own individual bag, but this -- the Ply 2 is in the

7    secondary bag.

8    Q    Ply 2, if you would, rip open or so we can -- in

9    comparison with Ply 1, am I correct that the form, the

10   preprinted form, appears identical between Ply 1 and Ply 2 up

11   to that section below -- well, I'll refer to it as the line

12   with the -- above which is 10, observer signature and 21,

13   observer signature?

14   A    Yeah, so Sections 1 through 21 are identical between those

15   two.  And then below the 21 box, it is different.

16   Q    And just going back, there is a Ply 3; correct?

17   A    Yes.

18   Q    And what's -- what happens to Ply 3 during this process of

19   submission.

20   A    The Ply 3 is a -- is just a -- it's another copy.  What

21   our staff does is we make a photocopy of the first, the

22   first -- the first Ply, since it's essentially the third Ply is

23   essentially a -- a specific copy of that first Ply.

24   Q    So in regard to comparison of Ply 1 and Ply 3, are they

25   virtually identical but for the fact that there is a sticker on

1  Ply 1 and there is none on Ply 3?

2  A    Correct.

3  Q    And but for the sticky whatever patch on Ply 1, once the

4  stickers are removed, it likewise is blank, as Ply 3?

5  A    Correct.

6  Q    But in Ply -- on Ply 2, there is or there are several

7  boxes that request information.  That is not reflected on Ply 1

8  nor Ply 3; correct?

9  A    Correct.

10 Q    Who would fill out that information on Ply 2?

11 A    So I believe you're indicating -- so there's a lab portion

12 that's completed by the lab, and then I believe there's a

13 shipping line.

14 Q    And that is person shipping, air bill number, date

15 shipped, and shipped to whom?  I'm sorry, the first three

16 boxes, person shipping, air bill number, date shipped, that

17 would be filled out by whom?

18 A    So our office, we do not fill that -- we do not fill out

19 that portion when we send it off.

20 Q    So that information is not on any of these documents;

21 correct?

22 A    Yeah, it's only specific to Ply 2.

23 Q    Well, how are these items then shipped?

24 A    They're shipped through FedEx.

25 Q    How do you keep a record of the shipping?

SCHMIDT - DIRECT

1   A    The tracking number that we send with FedEx, our front

2   desk staff gets an email notification when it gets shipped, and

3   then an email notification when it arrives to the CR

4   Laboratory, which is indicated where it specifically gets

5   shipped to.

6   Q    Now, I beg the Court's forgiveness, I believe you may have

7   answered these questions before when you first testified.  Did

8   you previously describe the FedEx shipment process?

9   A    I can't recall if I specifically did or not.

10  Q    With regard -- of your testimony, but do you recall that

11  there is information about the tracking; is that correct?

12  A    Yes.  So I'm not -- I'm not part of the shipping process.

13  That is our administrative staff, but I know we do utilize

14  FedEx and the shipping number, the tracking number that are on

15  the specific labels that we send out.

16  Q    And that's from your office to -- to the laboratory, not

17  on the way back; is that correct?  You follow it there but you

18  don't follow the laboratory, whatever reports -- well,

19  actually, the reports aren't shipped back to you?

20  A    Correct.  They're on an online database.

21  Q    So you receive the reports via electronic means?

22  A    Yes.

23  Q    And with regards to the consistency of the shipment of the

24  sample to the laboratory, and the reports that you receive in

25  return, what ties the two together?

1   A    I'm not sure I understand your question.

2   Q    How do you know that the sample you sent to the laboratory

3   and the report that you ultimately receive from the

4   laboratory -- how do you connect the two, the item you shipped

5   with the laboratory report that you receive in return?  Is

6   there a number that you -- that's consistent?

7   A    Yes.  And I believe I referred to it during my last

8   testimony.  I can't recall the specifics, but there's -- on the

9   lab report number -- on the lab report, itself, there's a

10  co-aligning number that matches with the chain of custody form

11  that we send off.

12  Q    So there is -- there are -- there are -- on each unique

13  form, there's a specific unique number that then becomes

14  associated with the sample?

15  A    Correct.

16  Q    And you fill out the form, and then that chain of custody

17  form allows you to connect the laboratory report with the

18  sample that you submitted so you can tie it back to the

19  individual whose sweat patch you removed?

20  A    Correct.

21       MR. COLLINS:  I don't know if I offered 7, but that

22  would be his or I can rely upon the Court's --

23       THE COURT:  Any objection to the admission of 7?

24       MS. STAFT:  No, Your Honor.

25       THE COURT:  It will be admitted.

1          (Government Exhibit 7 admitted)

2          THE COURT:  Cross examination?

3          MS. STAFT:  Thank you, Your Honor.

4                    CROSS EXAMINATION

5   BY MS. STAFT:

6   Q    Probation Officer Schmidt, so looking at Government's

7   Exhibit 7 on Ply 1, there's discussion about the -- the

8   stickers on the front.  Do you see those stickers there?

9   A    Yes.

10  Q    All right.  And there are three different stickers with

11  bar codes and the same -- the same number on each of these

12  three stickers; right?

13  A    Yeah, unique to that chain of custody form.

14  Q    Okay.  What is done with each of these three stickers?

15  A    So one is applied to -- because -- so again, there's two

16  bags, one's smaller than the other.  The patch, itself, goes in

17  its own individual bag.  One of these bar codes is placed on

18  that.  It's -- it needs to be somewhere on the -- they're clear

19  plastic bags.  Typically, it's placed on the top.  It can be on

20  the bottom, but as long as it's on that bag.  And then the

21  second one is typically applied on the secondary bag, the

22  larger bag with which then the security seal is placed on it.

23  And then the third one either stays on the chain of custody

24  form or is discarded.

25  Q    I'd like to turn your attention now to Government's

1    Exhibit 3.

2              (Indiscernible comments away from microphone)

3              MS. STAFT:  What's that?

4              MR. COLLINS:  You might need a different --

5              THE WITNESS:  Yes.

6              MS. STAFT:  Yes, if I could -- if I could approach,

7    Your Honor.

8              THE COURT:  Yes.

9    BY MS. STAFT:

10   Q    So I am handing you Government's Exhibit 3, the chain of

11   custody form of Ply 1, and PO Schmidt, do you see that there

12   are two -- it appears that there were two stickers with bar

13   codes and those -- that unique number still affixed to this

14   Ply 1 form?

15   A    Yes, I see two bar codes.

16   Q    Okay.  So that would indicate that -- that not all of the

17   stickers were applied to the either inner or secondary bag, as

18   required; correct?

19   A    Correct.

20   Q    Because if -- if two are required to be affixed to the

21   packaging, then if -- if any more than one of the three remains

22   on the form, then they would not have been labeled as

23   instructed?

24   A    I'm -- can you -- I'm sorry.  I don't understand the

25   question.

1  Q    That was a mouthful.  So -- so you said there are three

2  stickers that typically come with this.  One is applied on the

3  smaller bag that the patch goes into, and a second sticker is

4  put on the secondary, larger bag that is then sealed and sent

5  to -- sent to the lab.  Am I following you correctly?

6  A    Yes, yeah.  That is the procedures.

7  Q    Okay; all right.  But we see on Government's Exhibit 3

8  that two of the three stickers remain -- original three

9  stickers remain on the form.

10  A    That's correct.

11  Q    Indicating that only one sticker was -- was utilized.

12  A    Yes.  From what I can recall on this -- from what I see on

13  this sheet, I was not the officer who did the removal, so I

14  can't attest to specifically what -- why that is.

15  Q    Okay.  And going to next refer to Government's Exhibit 5,

16  that chain of custody form, if I could approach.  And how many

17  stickers remain attached to this Ply 1 chain of custody form?

18  A    There are two bar codes.

19  Q    Okay.  Again, that indicates that there were not -- that

20  the two stickers could not have been used in the packaging of

21  the -- of the sample as required?

22  A    Correct.

23  Q    All right.  And you went through training as to the

24  correct procedures for -- for application and removal of these

25  patches?

1  A     Yes.

2  Q     And as far as -- and additionally, you went through

3  training on how to fill out these forms?

4  A     Yes.

5  Q     All right.  And there is a box, it's Box 16, on all the

6  forms that is a question about tampering; correct?

7  A     Yes.

8  Q     All right.  And in your training, it was emphasized

9  that -- that this section must be filled out for all patches?

10 A     From the training, no -- (indiscernible - garbled speech)

11 received, yes.  We are needed to indicate whether we noticed

12 any tampering or anything compromised with the patch.

13 Q     And did you, in fact, indicate on each of these forms that

14 you collected whether there was tampering evident?

15 A     The ones I completed, I believe, from what I reviewed, I

16 did indicate on those.

17 Q     Okay.  But the -- but that box was not filled out in

18 the -- the other forms; correct?

19 A     Which other forms are you referring to?

20 Q     There are some other forms where -- where the tampering

21 box was not filled out; is that correct?

22 A     I believe in the evidence that's provided, yeah, there --

23 there were a few of the chain of custodies that that was left

24 blank.

25 Q     Okay.  But if you weren't the one to fill out that

1  document, you wouldn't have any reason to know what happened

2  there?

3  A    Correct, yeah.  I wasn't the officer who did the removal,

4  so I'm not sure why that was not indicated.

5            MS. STAFT:  I don't have any further questions, Your

6  Honor.  Thank you.

7            THE COURT:  Thank you.

8            MS. STAFT:  If I could just retrieve those exhibits?

9            THE COURT:  Yes.

10           Mr. Schmidt, if I understand correctly, you have a

11  small bag that the patch goes into, and one of the bar code

12  sealers, one of the seals with the bar code go onto that.  And

13  then the second one's supposed to go on the secondary bag, and

14  then that secondary larger bag also gets sealed with this long

15  strip?

16           THE WITNESS:  Yes, correct, yeah.

17           THE COURT:  All right.  So if -- well, this would be

18  actually a question for the Doctor, probably, but when that

19  seal is broken, do you know if -- what happens to it, if you

20  follow me?

21           THE WITNESS:  So I do know that they won't test --

22  like the Doctor stated, I believe that they won't test if that

23  seal is broken.  And they'll send back that they -- they were

24  unable to test due to the breach in that seal.

25           THE COURT:  Yeah.  I mean, if the seal is opened, is

1  it possible, then, that there's not a number on the bag, a

2  readable number on the bag?

3          THE WITNESS:  Which bag are you referring to, the

4  larger or the smaller one?

5          THE COURT:  The larger secondary bag.

6          THE WITNESS:  So there's this bar code that's placed

7  on it, one of the bar codes --

8          THE COURT:  Well, but, in two of our exhibits here

9  today, it does not appear that a second bar code was put on the

10  secondary bag.  So I guess my question is, is if -- if you

11  know; you may not -- when they open that seal, does that then

12  destroy the identification number on that bag?

13          THE WITNESS:  That would be a question, I believe,

14  for the lab.  But if you're referring to if we placed that bar

15  code number directly under the security seal -- if I had the

16  bags, it would be easier to explain.  But we typically leave

17  enough space to where when they tear that seal, it would not

18  interfere with that bar code number.

19          THE COURT:  That's how you would leave the

20  identification number on the --

21          THE WITNESS:  Right.

22          THE COURT:  -- secondary bag?

23          THE WITNESS:  Yeah.

24          THE COURT:  Okay, thank you.  I have no further

25  questions.  Anything further for your witness, Mr. Collins?

```
 1           MR. COLLINS:  Well, I need some clarification now.  I
 2    just want to make sure that I am tracking.
 3                         REDIRECT EXAMINATION
 4    BY MR. COLLINS:
 5    Q    First, just so we're -- so that we're talking about the
 6    same things, we've been referring to bar code stickers, and
 7    each -- those would be under 23, 24, 25.  And those have the
 8    same specimen number that's on the form preprinted; correct?
 9    A    Correct.  And those bar codes specifically have -- because
10    we don't utilize those bar codes for anything, aside from
11    the -- the indication of what chain of custody form they are.
12    So I believe they're more use for the lab, itself.
13    Q    And then there is a separate sticker that doesn't
14    conveniently have a number next to it, but perhaps it's 26,
15    that I'll refer to as the security seal; correct?
16    A    Correct.
17    Q    And that, too, bears the same specimen number from the
18    form, and that's reflected on the three separate bar codes;
19    correct?
20    A    Correct.
21    Q    As well as the bar code at the bottom, looks like?
22    A    Yes, correct.  So on a typical chain of custody, I count
23    six of the same number indicating that it's associated with
24    this chain of custody, all the same number.
25    Q    So then when you -- back to when you process a sweat
```

1   patch, you've removed it, you've filled out whatever, you put

2   the sweat patch into its own plastic bag --

3   A    Correct.

4   Q    -- and onto which, then, you take one of the bar code

5   stickers and affix that to that inner -- or that small plastic

6   bag?

7   A    Correct.

8   Q    Then you take that plastic bag with the bar code, and

9   insert that into another envelope?

10   A    Correct.

11   Q    And --

12   A    And we place the Ply 2 copy in that envelope, as well. So

13   there's no contamination of the sweat patch, itself.

14   Q    And onto that, is that where you place the security seal?

15   A    Yes.

16   Q    Binding the two ends together so that there would be

17   evidence of someone accessing the inner envelope; correct?

18   A    Correct. And the inner one has an adhesive material just

19   to make sure that the patch doesn't fall out of it, but there's

20   no seal on that secondary, the smaller of the bags that's

21   inside the larger one.

22   Q    And then the -- on occasion, you do apply or did apply in

23   this case, another bar code sticker. Where would that -- where

24   would you or the other officer have applied that in the normal

25   course of processing?

A    So -- yeah, so one's on that smaller bag, and then we
would just place it anywhere.  It's a clear bag.  We would --
we would place it anywhere on that bag indicating the number.

Q    So it's a redundancy to the security seal with the unique
number; is that correct?

A    I'm not sure I understand your --

Q    I mean, you have the number, unique identifying specimen
number on the security seal?

A    Correct.

Q    And that is used to seal the second larger envelope.

A    Uh-huh.

Q    And then you have -- if you put another bar code, it would
just simply be a repeat of the same number; is that correct?

A    Correct, yeah.  So there's no difference in any of these
bar codes.  I'm not sure -- that's, I believe, a question for
the lab, specifically what they use those for.  But for us, the
main concern is that make sure that security seal is on the bag
and at least one of these bar codes is applied.

Q    And to your -- based upon your training and experience, if
this security seal, when it arrives at the laboratory, has been
breached, opened, the lab will not conduct an analysis, it will
reject it; correct?

A    Correct.

          MR. COLLINS:  I have no other questions, Your Honor.

          THE COURT:  Mr. Schmidt, is the small bag sealed,

1    that has the sweat patch in it?

2         THE WITNESS:  So it's -- it doesn't have a seal

3    specific on it, but it has an adhesive material kind of like

4    maybe an envelope, but we would peel that off so the patch,

5    itself, wouldn't fall out.

6         THE COURT:  So it is sealed, like an envelope?

7         THE WITNESS:  Yes, yeah.  Essentially, it would be

8    like an envelope sealed.

9         THE COURT:  Okay.  So the envelope with the patch in

10   it and Ply 2 goes in the secondary bag?

11        THE WITNESS:  Yes.  And if the Court would want a

12   reference, I'd be happy to show the Court the specific bags to

13   get an idea.

14        THE COURT:  That's okay.  All right.  Thank you.

15   Anything further, Ms. Staft?

16        MS. STAFT:  No, Your Honor.

17        THE COURT:  Okay.  Thank you; you can step down.

18        THE WITNESS:  Okay.  And where did Exhibit 7 go?

19        MR. COLLINS:  Give it to the Court, please.

20        THE COURT:  Thank you.

21        (Witness excused)

22        THE COURT:  All right.  Any further witnesses for the

23   Government?

24        MR. COLLINS:  No, Your Honor.

25        THE COURT:  Any witnesses for the defense?

1          MS. STAFT:  No, Your Honor.

2          THE COURT:  Argument, Mr. Collins?  You can -- can

3   stay seated.  That's fine.

4          MR. COLLINS:  Sorry, old habits.  Your Honor, I would

5   submit that the Probation Office has supported its petition

6   that the defendant, Mr. Yang, contrary to the conditions of his

7   supervision, ingested controlled substances, which is

8   corroborated by the laboratory analysis upon which they relied

9   in submitting their reports.  We have discussed at length

10  multiple Plies, but I leave it to the Court to decide whether

11  the chain of custody has been broken.

12         THE COURT:  All right.  Ms. Staft?

13         MS. STAFT:  Thank you, Your Honor.  I -- I do think

14  there are significant problems with the -- the veracity of the

15  results here, seeing as though we've encountered multiple

16  problems and irregularities in the -- in the documentation

17  regarding these samples.  For instance, some specimens were not

18  properly labeled when -- when collected and shipped to the lab,

19  as indicated by -- by in at least two instances, the -- we have

20  two stickers with the bar codes and numbers remaining on the

21  Ply 1 forms, which shows that those -- you know, the bags that

22  were sent to the lab were not properly labeled.  We don't have

23  documentation of -- regarding who handled the specimen from the

24  time -- any of the specimens from the time that they were

25  collected to the time when they were opened and processed by --

1    by the lab.  There's no indication of who -- who shipped them,

2    where they were sitting during -- during any lag in -- in

3    shipment, you know, who had access to that, to the facility

4    where they were being stored, any of that documentation to

5    ensure an unbroken -- a reliable chain of custody.  So I think

6    that this presents -- that presents problems.

7            And significantly, the tampering box is required to

8    be filled out in each of these forms, and in every single case,

9    but on many of the samples, there is either no documentation

10   whatsoever as to whether the patch appeared to be tampered with

11   or compromised, so it's possible that -- that it could have

12   been tampered with or compromised but it's just -- there's just

13   no record or indication as such.

14           And in, additionally, some other instances, we have a

15   positive indication that the -- that the patch did appear to be

16   tampered with or -- or compromised, and certainly, it doesn't

17   make sense that that would be a required -- that that

18   information would be required on every single form if that

19   couldn't potentially lead to false positive or otherwise

20   undermine the reliability of the -- of the test results.  So

21   while the lab could still perform their -- their test, that

22   doesn't obviously foreclose the possibility of -- of

23   contamination and doesn't indicate, necessarily, that the

24   result of the test, that the metabolites that they found in the

25   patch did, indeed, come from -- come from Mr. Yang.

1       So for all those reasons, I -- I think that there is

2    insufficient evidence to establish a violation.

3       THE COURT:  You don't think the Government's met

4    their burden by preponderance of the evidence?

5       MS. STAFT:  Your Honor, I -- I will -- I will concede

6    that it is -- that's a, you know, a close call, but -- since it

7    is a lower -- a lower standard.  However, I think with these

8    irregularities and the -- the indications of, you know, the

9    patches being compromised, and not knowing what happens to

10   the -- to the patches along the way, that it calls into

11   question these results.

12      THE COURT:  Well, my review of these, it is

13   Government's Exhibit 5 and Government's Exhibit 6 that had no

14   check on whether they appeared to be tampered with or

15   compromised.  Now, I believe there was testimony from

16   Dr. Kabulski that the test would not be done if -- if the patch

17   appeared to be tampered with or compromised in a way that would

18   affect a test result.  Do you have any challenge to that

19   testimony, Ms. Staft?

20      MS. STAFT:  Your Honor, I don't believe he said that

21   the -- the test wouldn't be done if -- if the patch appeared to

22   be tampered with or compromised.  I believe what he said is

23   that only if the tape was still attached to the patch would

24   they reject it for -- for testing, but they do no further

25   inquiry as to any other kind of possible compromising or

1    tampering of the patch.

2            THE COURT:  He was asked, though, like on

3    Government's Exhibit 4, where it said the patch was broken up

4    and adhesive seemed to be peeled, if that would affect the test

5    result.  And he said no, is my recollection.  Do you have a

6    different recollection?

7            MS. STAFT:  Your Honor, my recollection is that he

8    said that they could -- that it didn't affect their ability to

9    test the patch and to test the -- the substances that were on

10   that patch and the state that they received it.  However, it

11   didn't -- but they didn't have a way -- it doesn't say anything

12   about what happened to the patch previously.

13           THE COURT:  All right.  Mr. Collins, do you have any

14   response?

15           MR. COLLINS:  I do, Your Honor.  And please take this

16   in the vein in which it is intended, because I --

17           THE COURT:  That sounds ominous.

18           MR. COLLINS:  Well, it does, because it sounds as if

19   Ms. Staft was making a misrepresentation, but I don't want to

20   ascribe that to be a misrepresentation of the record.  I think

21   it's the fact that we've had a break that we might not recall

22   what was testified; that's all.

23           At the last proceeding, Officer Schmidt testified as

24   to the delay about the sending off of the actual patches, that

25   the office collects the patches, the submissions, and then

sends them in bulk so that that explains why there was a delay
in the receipt by the laboratory.  And so I just want to make
that clear.  It may be a recollection, not a misrepresentation.

As to the chain of custody and the tampering, I guess
one thing -- and perhaps I admit that I failed to develop and
ask, what is considered tampering versus normal wear and tear
or is tampering such that it compromises the integrity, and I
think that the doctor testified that there was no evidence of
anything that would compromise the integrity of the sample for
its being analyzed, and so I submit that while we refer to as
tampering, we should be more specific and there was no evidence
that it was compromised in a way that would invalidate the
analysis.

They did -- Dr. Kabulski did testify that the
laboratory will not accept samples with the adhesive still
intact and would not accept for analysis any with the security
seal broken, but there's no indication that any of the samples
submitted were, in fact, tampered with in a way that would make
the analysis questionable.

THE COURT:  All right.  Well, we have a difference of
opinion as to what was said.  I'm going to -- let me also ask,
Mr. Collins, what's the Government's position on Violation
Number 5 alleged, that -- it says here the defendant was
arrested for driving while under the influence, and that's
alleged to be a violation of condition, you don't commit

1  another federal, state, or local crime.

2        MR. COLLINS:  At the last proceeding, Your Honor, we

3  gave notice that we would not be --

4        THE COURT:  You're dismissing that one?

5        MR. COLLINS:  Yes.

6        THE COURT:  Okay.  Thank you.  All right.  So the

7  question then is 1 through 4 and 6 and 7.

8        MR. COLLINS:  Yes.

9        THE COURT:  All right.  Ms. Staft, are you arguing

10  that not having Ply 2 filled out with the administrative person

11  who -- who put it into Federal Express, that that is -- is a

12  fatal defect, not overcome by the seals on the bags that match

13  with the defendant's initials on them when it arrives at the

14  lab?

15        MS. STAFT:  Well, Your Honor, I think if we had

16  additional, you know, documentation about -- or evidence

17  regarding, you know, what -- what happens with those -- with

18  those packages, and how they are protected and, you know, who

19  had the -- you know, whether they were kept in a place, you

20  know, where they -- you know, others couldn't access them,

21  the -- I think that it may not present such big problems, but I

22  think that with, you know, the lack of that -- that information

23  on the chain of custody document, coupled with the lack of

24  information about, you know, the measures taken to -- to

25  protect the samples in the meantime do present issues.

THE COURT: What is your theory would have happened to the packages?

MS. STAFT: Well, Your Honor, you know, I think that -- I think that it is -- I mean, I would certainly obviously only be speculating. It is probably unlikely that somebody were to, you know, come in and remove the -- you know, carefully remove the -- the -- you know, the seals and contaminate it. However, we just don't have any information about that, or what happened along -- along the way. So -- but again, I do think that it is significantly more problematic that the -- that the indications regarding tampering are either not present or were -- or essentially ignored in this case. I think there is a much more significant possibility of contamination, unreliable results, when there is evidence of -- of tampering or from the -- just the collection and removal process, or the application and removal process, I will submit, then, after -- after the samples are sealed in the bag.

THE COURT: Right now, even with the arguments that the defense has made, I think Violation Number 2 and 3 don't share any of the defects that the defense has expressed concern about. The seals were intact when they were received in the laboratory. The Government's proven that. There's no indication either of those samples were tampered with. So the remaining question on those two is whether it's really a serious defect in the Government's proof that we don't know

exactly how the administrative process works or where the

packages are maintained in the office before they're shipped

out.

But again, I don't hear a theory, Ms. Staft -- I

mean, it sounds to me if these seals are intact, the theory

would have to be that, what, somebody uses a needle to put

something onto the sweat patch through the sealed documents and

that somehow goes undetected?  I mean, it's --

MS. STAFT:  Your Honor, if I may, just with regard to

those two, two instances that you mentioned regarding

Allegations 2 and 3, with regard to Allegation 2, that is

Government's Exhibit 2, I would just note that the chain of

custody form has no denotation whether the patch was tampered

with or compromised at all.  So it is -- it is possible that it

could have had that appearance, that it just was not indicated.

And with regard to Number 3, it is, in this instance

Government's Exhibit 3, with the two patches remaining.  You

know, in this case, we just don't know if -- I think it would

be certainly more problematic if the -- the bag that the -- the

smaller bag that the patch goes into was not labeled with one

of these bar codes.  Unfortunately, we don't know which bag

was -- was left unlabeled.  I think without -- you know,

without specifically labeling the patch -- the bag with the

patch in it, the smaller inner bag, that that does leave open

the possibility of, you know, putting the wrong patch in the

1    wrong bag.  I frankly don't know, you know, their procedures to

2    know whether they have multiple -- you know, multiple patches

3    that they're processing at the same time and whether that could

4    be a possibility of, you know, one patch accidentally going

5    into one bag with the wrong form, just as a mistake.

6             THE COURT:  Well, actually, I'd like to re-call

7    Mr. Schmidt to the stand, please.

8             And I remind you, you remain under oath.

9             When you are dealing with someone and removing a

10   sweat patch and putting it into these bags, are you ever

11   dealing with more than one sweat patch at a time?

12            THE WITNESS:  No, Your Honor.

13            THE COURT:  All right.  And in your experience, do

14   you always put a -- one of these bar code stickers on the small

15   bag?

16            THE WITNESS:  In my experience, I use two bar codes,

17   one on the smaller bag and then one on the larger bag.  That's

18   what we were -- the training procedures are.

19            THE COURT:  Okay.  And which of these tests did you

20   do?

21            THE WITNESS:  I can't recall off the top of my head,

22   but it would have my initials of BRS in the removals, and then

23   it would have my name on the application under the observer

24   portion.  I know I did do the initial one.  That I know for

25   sure.

```
1            THE COURT:  You did the first one?

2            THE WITNESS:  Yeah.

3            THE COURT:  The second one -- yes, you did the second

4    one, although we don't have Ply 1 for Exhibit 2.  Who would

5    have Ply 1?  Would you all have Ply 1?

6            THE WITNESS:  We would, yeah.  I believe that was --

7    I was -- I was thinking that was Ply 1, but we would have a

8    copy of Ply 1, if the Court would need it.

9            THE COURT:  All right.  And you did -- your signature

10   appears on Government's Exhibit 3, and Government's Exhibit 4,

11   and Government's Exhibit 5.  Well, now, I stand corrected.

12   Your signature appears as the donor's -- I'm sorry.

13           Let me hand you all of these and you tell me which

14   you did.  All right?

15           THE WITNESS:  So I believe this is -- so I guess I

16   will refer to the sample ID.

17           THE COURT:  Well, there should be a Government's

18   exhibit number written in by hand on the front of the first

19   page.

20           THE WITNESS:  Oh, yes.  So for Exhibit 1, I did the

21   application and removal.

22           THE COURT:  Okay.  So that would mean you're the

23   person who shipped it off?

24           THE WITNESS:  No.  So that would indicate that I was

25   the officer who removed it and sealed it.
```

```
 1            THE COURT:  That's what I mean.

 2            THE WITNESS:  Yes, yeah.

 3            THE COURT:  You're the one who would have put it in

 4   the small bag and then the big bag?

 5            THE WITNESS:  Correct, yeah.  As far as the shipping

 6   method, that -- they then get stored in our -- in our testing

 7   lab in the Probation Office, until they get shipped out by our

 8   admin staff.

 9            THE COURT:  And where are they stored?

10            THE WITNESS:  They're stored in a drawer in our drug

11   testing lab that we do the urine testing and --

12            THE COURT:  And who has access to the lab?

13            THE WITNESS:  Only those that have access to our

14   office.

15            THE COURT:  So people who work there and probation

16   and pretrial service officers?

17            THE WITNESS:  Yes.

18            THE COURT:  And are any defendants ever left alone

19   with those?

20            THE WITNESS:  No.

21            THE COURT:  And if you know what the process is that

22   once they go in the drawer, can you tell us, if you know?

23            THE WITNESS:  So I believe every Friday, the

24   specimens that were removed during that week are then placed

25   in -- I believe it's a manila envelope, and then they're placed
```

1   in a FedEx express, those kind of -- the pre-created express

2   shipments, and they get dropped off at the FedEx box here in

3   the building.

4           THE COURT:  Okay.  And the person who does that is an

5   employee?

6           THE WITNESS:  Yes.  They're the admin staff of our

7   office.

8           THE COURT:  Okay.  And do you know if they do it

9   right away or are they left, like, hanging out on a desk in the

10  front office that anybody walks by and sees.

11          THE WITNESS:  I believe -- from what I recall of the

12  procedures that I've been informed of, they -- as soon as they

13  ship -- they place it in the shipment box, they drop it off at

14  the FedEx box here in the building.

15          THE COURT:  All right.  Thank you.  Okay, so

16  Government Exhibit 1 you did the application and removal.  How

17  about 2 through 6?

18          THE WITNESS:  So Government Exhibit 2, I did the

19  application and not the removal.

20          THE COURT:  Who did the removal, if you can tell?

21          THE WITNESS:  That is Officer McKinstry, Samuel

22  McKinstry.

23          THE COURT:  Okay.

24          THE WITNESS:  Exhibit 3, that would be Officer

25  McKinstry who did the application and Officer Astle who did the

1   removal.

2           THE COURT:  Okay.

3           THE WITNESS:  Exhibit 4, I did both the application

4   and removal.  And Exhibit 5, I did the application and Officer

5   McKinstry did the removal.  Exhibit 6, Officer McKinstry did

6   the application and Officer Castro did the removal.

7           THE COURT:  Okay.  Thank you.  Any questions for

8   Mr. Schmidt, Mr. Collins?

9           MR. COLLINS:  No, Your Honor.  Thank you.

10          THE COURT:  Ms. Staft?

11          MS. STAFT:  No, Your Honor.

12          THE COURT:  Okay.  Thank you.  You can step down.

13          (Witness excused)

14          THE COURT:  All right.  I think with this additional

15  testimony I'm comfortable about the chain of custody, as far as

16  there not being an opportunity for tampering.  I do want to

17  check and see if there's any case law that suggests it's not

18  sufficient when something arrives in a lab with a seal -- seal

19  intact that has the defendant's initials on it.  I think that

20  that is probably an excellent protective measure.  And I do

21  need, I guess at this point, to check the transcript as to what

22  the doctor said about tampering.  I think that the point on the

23  Ply 1, I don't think it necessarily means or should be read to

24  mean that it was tampered with or compromised to such an extent

25  that it can't result in a -- a valid test.  But since we have a

difference of opinion on exactly what the doctor said on that

topic, I will consult the transcript before I make a ruling.

Anything further for today, Ms. Staft?

MS. STAFT:  Your Honor, not on this topic.  We do

have a -- just a quick collateral matter that I'd like to

address.

THE COURT:  All right.  What's that?

MS. STAFT:  Your Honor, regarding Mr. Yang's

conditions of release, it's my understanding that -- that

Probation is in support of dropping any third-party supervision

requirement, since Mr. Yang has been doing well, and more

importantly, has obtained employment.  So, you know, the intent

is to allow him to -- to attend that without needing any

third-party supervision.

I had intended to, after consultation with Probation

Officer Schmidt and Mr. Collins, to ask the Court to modify it

to remove the third-party requirement.  And to be clear, my

understanding is Mr. Collins takes no position, but that he's

not, you know, specifically agreed.

However, in reviewing the -- the conditions at

Document -- or Docket 128, it actually appears that the

third-party supervision box wasn't filled out.  So I don't

think that we actually need to -- to modify the current

conditions, but I did just want to -- to clarify for the record

whether that was permissible for Mr. Yang to be unsupervised by

1  a third-party.

2          THE COURT:  Mr. Schmidt, what's your position?

3          OFFICER SCHMIDT:  Yes, Your Honor.  I've been in

4  contact with Immigrations, the assigned officer, and he has

5  provided me adequate proof that he is now -- legally, he's able

6  to gain employment under his immigration status, so Probation

7  does not -- is for the support of the removal of the

8  third-party.

9          THE COURT:  All right.  Then that's fine.  That's

10  agreeable.

11          MS. STAFT:  Thank you.

12          THE COURT:  There doesn't need to be any change in

13  the order, itself.

14          All right.  I will order a transcript and will issue

15  a written opinion, probably a very short one, after I have a

16  chance to review that transcript.  It is somewhat difficult for

17  all of us, I think, when the hearing is stretched out over a

18  month.

19          Thank you.  Court will stand in recess.

20          DEPUTY CLERK:  All rise.  This matter is adjourned.

21  This court now stands adjourned subject to call.

22          (Proceedings concluded at 4:08:07 p.m.)

23

24

25

1          CERTIFICATE

2          I, R. Joy Stancel, Federal Official Realtime Court

3  Reporter in and for the United States District Court for the

4  District of Alaska, do hereby certify that the foregoing

5  transcript is a true and accurate transcript from the digital

6  record in the above-entitled matter and that the transcript

7  page format is in conformance with the regulations of the

8  Judicial Conference of the United States.

9          Dated this 11th day of June, 2021.

10

11                         /s/ R. Joy Stancel
                  _____
                     R. JOY STANCEL, RMR-CRR
12                FEDERAL OFFICIAL COURT REPORTER

13

14

15

16

17

18

19

20

21

22

23

24

25